**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **H&H HOLDING, L.P.** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **CHI CHOUL LEE and HYE JA LEE** | : | **No. 12-5433** |
| | : | |
| | : | |

**NORMA L. SHAPIRO, J.**                                                  **MARCH 6, 2014**

<u>**MEMORANDUM**</u>

Plaintiff H&H Holdings, L.P. ("H&H Holdings") filed an action for damages under the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6972, ("Count I"), the Pennsylvania Land Recycling and Environmental Remediation Standards Act, 35 P.S. § 6026.101 ("Count II"), and Pennsylvania contract law ("Count III"), against defendants Chi Choul Lee and Hye Ja Lee d/b/a Prez Cleaners ("Prez Cleaners").[1]  The court has federal question jurisdiction under 28 U.S.C. § 1331 and supplemental jurisdiction under 28 U.S.C. § 1367.  The court previously dismissed the Count II claim under the Pennsylvania Land Recycling and Environmental Remediation Standards Act because the statute does not create a private cause of action.

Before the court is defendants' motion for summary judgment.  The court will grant summary judgment on Count I in favor of defendants because plaintiff has failed to establish imminent and substantial endangerment.  The court will use its discretion under § 1367 to retain the contract law claim.

---

[1] Count I also alleged a claim under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9602.  The court dismissed the CERCLA claim under Count I for lack of any factual allegation in the complaint.

## I.      Background

H&H Holdings is a small corporation that owns the two-acre property at 1625 Haines

Road, Levittown, Bristol Township, Bucks County, Pennsylvania.  In 2010, H&H Holdings

applied for a bank loan.  As part of that loan application, National Capital Management

contracted Barry Issett & Associates ("BIA") to perform a Phase I Environmental Site

Assessment ("Phase I").  At the time of the assessment, the property was a retail strip mall with

eleven occupants, including Prez Cleaners, a local dry cleaning business owned and operated by

defendants, Chi Choul Lee and Hye Ja Lee.  ECF No. 14, Ex. P-1.  Prez Cleaners, under the

ownership of defendants, had operated as a dry cleaning establishment on the property since

1984.  ECF No. 14, Ex. D-4.  There had been a dry cleaning facility operating in that location

since the site was constructed in the mid-1960s.  ECF No. 14, Ex. P-1.

BIA, a structural and civil engineering firm, performed Phase I and submitted its report in

July 2010.  ECF No. 14, Ex. P-1. The purpose of the study was to identify recognized

environmental conditions ("REC") present on the property.  *Id.*[2]  Through government databases,

BIA found Prez Cleaners was "a small quantity generator of hazardous waste,"[3] and identified

four other nearby sites investigated by the EPA or subjected to corrective action because of a

release: Northeast Paint and Varnish Company, Childers Products, Safety-Kleen, and Printed

Circuits, Inc.  *Id*.  BIA later determined these additional sites had minimal potential to impact the

property.  *Id*.  BIA then performed a site observation of Prez Cleaners and reported it used and

---

[2] BIA used "visual observation, review of reasonably ascertainable government databases, and interviews of the current property owner and municipal officials in preparation for the report . . . This Phase I ESA did not include sampling of any materials on-site. The report was limited to the time and budgetary constraints specified in the proposal for this assessment." ECF No. 14, Ex. P-1.

[3] The report also states that "[t]here have been reported spills or violations with regard to this RCRA Generator site." *Id*.  No other evidence of record, including the deposition of plaintiff's proffered expert David Bell, corroborates this finding.  Mr. Bell and a plaintiff representative both testified in deposition that they were not aware of any spills on the Prez Cleaners property. ECF No. 14, Ex. P-1, pg. 5; Bell Dep. 71:15-19, April 16, 2013 (ECF No. 14, Ex. P-3); Levitt Dep. 30:1-31:9, March 11, 2013 (ECF No. 13, Ex. D-2).

stored Tetrachloroethylene (also known as Perchloroethylene) ("PCE"), a chemical widely employed for dry cleaning fabrics and classified by the EPA as a likely human carcinogen.  ECF No. 14, Ex. P-4 (Part 2).  BIA stated Prez Cleaners placed its dry cleaning machine on a concrete slab and kept an additional 35-gallon drum of PCE next to the machine. ECF No. 14, Ex. P-1. Neither the machine nor the drum had a secondary container and BIA reported the "use of PCE for over 25 years with no secondary containment over a concrete floor in fair condition represents an environmental concern."  *Id.*  The Prez Cleaners' manager interviewed by BIA stated the machine used all the solvent in the cleaning process and no spent fluids remained to recycle.  *Id*.

Based on these visual observations alone, the Phase I report categorized Prez Dry Cleaners as an REC, defined as

> the presence or likely presence of any hazardous substances or petroleum products on a property under conditions that indicate an existing release, a past release, or a material threat of a release of any hazardous substances or petroleum products into the structures on the property or into the ground, ground water, or surface water of the property.

*Id*.  The report then stated

> [d]ue to the volatile nature of the chemicals used in the dry-cleaning process, they do not stain materials they come in contact with.  Therefore, based upon visual observations alone, a release cannot be determined without sampling. . . The presence of dry cleaner utilizing hazardous chemicals is considered an REC that warrants further action.

*Id*.  BIA made two recommendations: 1) completion of a soil boring and sampling program to determine if the use of the halogenerated solvents (i.e., PCE) have impacted the subsurface around the dry cleaning tenant space; and 2) storage of drums containing PCE on a secondary containment structure to prevent the spread of contamination in the event of a future release.  *Id*.

In September 2010, National Capital Management commissioned a Limited Phase II Site Investigation ("Phase II").  BIA conducted the Phase II investigation on September 23, 2010, and

3

July 7, 2011.  ECF No. 14, Ex. P-2.  In September, BIA installed five "Geoprobe borings in the asphalt around the exterior, rear door of the dry cleaning tenant space" in a total area of forty square feet.  *Id*.  BIA, installing the borings four feet below the surface and collecting two soil samples from each soil column, provided ten samples for laboratory analysis.  BIA compared the concentration of PCE in the soil samples to the acceptable level of PCE based on the soil to groundwater numeric value of the Pennsylvania Department of Environmental Protection ("PA DEP") Medium-Specific Concentrations for Organic Regulated Substances in Soil.  *Id*.  The PA DEP acceptable value, referred to as a state wide health standard ("SHS"), is no more than one half milligram of PCE for every kilogram of soil (.5mg/kg).  *Id*.  Four of the samples showed levels of PCE above the SHS.  *Id*.  The Phase II report recommended additional site characterization so that BIA could further quantify the potential PCE impact on the soil.  *Id*. Plaintiff's proffered expert, David Bell, performed both the Phase I and Phase II studies.

In July 2011, BIA implemented a second sampling plan and installed seven additional borings at the rear of the dry cleaning facility, including two borings actually inside the dry cleaning room where defendants used PCE.  ECF No. 13, Ex. D-1.  Of the twenty-eight tested samples, thirteen showed levels of PCE above .5mg/kg.  ECF No. 14, Ex. P-2.  BIA cautioned that the current site data would not provide a comprehensive analysis of the horizontal and vertical extent of PCE concentrations in the soil.  ECF No. 13, Ex. D-2.  The report raised the possibility of PCE moving gradually into the permeable bedding materials around the local utilities.  BIA did not refer to any water samples or geological studies supporting this possibility. It suggested that, because of nearby water, sewer and gas utilities "additional sampling may be required to determine how far under the building pad and along utility lines the contaminant has reached."  *Id*.  Prior to any potential remediation efforts, BIA recommended three steps: 1) H&H

4

Holdings and its attorney meet with BIA to discuss the sampling results; 2) additional borings and soil sampling be conducted, both inside and outside the building; and 3) H&H Holdings file a Notice of Intent to Remediate with the PA DEP because remediation at the site would most likely be done under the Voluntary Cleanup Program. *Id*.

The Phase II investigation was the last sampling done on plaintiff's property.  A little over a year after the report from BIA on the Phase II investigations, plaintiff filed the instant action against the owners of Prez Cleaners.  Since the filing, the lease between plaintiff and defendants ended and defendants have vacated the property.

## II.    Motion for Summary Judgment

A motion for summary judgment will be granted only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The movant must identify those portions of the record showing the absence of a genuine issue of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A dispute is "genuine" only if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

### A.    Resource Conservation and Recovery Act

#### 1.    Imminent and Substantial Endangerment

The "RCRA is a comprehensive environmental statute that governs the treatment, storage and disposal of solid and hazardous waste." *Meghrig v. KFC Western, Inc.*, 516 U.S. 479, 483 (1996). The RCRA permits a private party to bring a lawsuit against persons "who ha[ve] or who [are] contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment." 42 U.S.C. § 6972(a)(1)(B).  To show imminent endangerment, a

5

plaintiff must demonstrate a potential harm that threatens to occur immediately.  *Id.* at 480.  "[A]n endangerment is substantial if there is some reasonable cause for concern that someone or something may be exposed to a risk of harm . . . if remedial action is not taken."  *Id.*  "[T]here must be a threat which is present *now,* although the impact may not be felt until later."  *Id.* at 486.

The Court of Appeals has further defined the imminent and substantial endangerment standard

> [P]laintiffs need only demonstrate that the waste . . . 'may present' an imminent and substantial threat . . . Similarly, the term "endangerment" means a threatened or potential harm, and does not require proof of actual harm . . . The endangerment must also be 'imminent' [meaning] threatens to occur immediately . . . Because the operative word is 'may,' however, the plaintiffs must [only] show that there is a potential for an imminent threat of serious harm . . . [as] an endangerment is substantial if it is 'serious' . . .  to the environment or health.

*Interfaith Cmty. Org. v. Honeywell Int'l, Inc.*, 399 F.3d 248, 258 (3d Cir. 2005).  The legislative history and language of the RCRA ensures any errors in applying the endangerment standard "be made in favor of protecting public health, welfare, and the environment." *Id.* at 249 (internal citation omitted).

In *Interfaith*, a nonprofit community organization brought a RCRA claim against a chrome manufacturer in possession of a landmass with over 1,500,000 tons of waste.  *Id.* at 252-53.  The district court found the amount of hazardous waste "far exceeded all applicable [New Jersey Department of Environmental Protection] contamination standards for soil, groundwater, surface water, and river sediments adjacent to the [landmass]." *Id*.  The plaintiff's evidence showed soil contamination an average of 30 times higher, surface water contamination over 300 times higher, groundwater contamination from 200 to 8,000 times higher, and river sediment contamination ranging from 90 to 400 times higher than the applicable state standards.  *Id*.  The

evidence not only showed high concentrations of chemicals, but also "present and continuing pathways for exposure such that both human health and the environment were endangered." *Id*. Defendant admitted the chemicals had discharged into a local river, the chemicals were seeping into the ground surface and mixing with water run-off, and there were holes in the plastic liner surrounding the site. *Id*. There was also evidence of human trespass on the property and use of the river, including damage to the fencing, trash, fishing equipment and graffiti. *Id*. at 262.[4] The Court of Appeals affirmed the district court's finding of liability following a bench trial. However, the court rejected the district court's use of a heightened standard requiring plaintiffs to show levels of contamination above that considered acceptable by the state. *Id*. at 259.

The Court of Appeals considered legislative history and a consensus among courts of appeals in finding Congress did not intend the RCRA to be dependent on state health standards. *Id*. at 260. The lower court erred in requiring plaintiff to show the contaminant was present at levels above a state health standard because the state standard did not define a party's liability under the RCRA. *Id*. at 260; 261 n.6. However, "[p]roof of contamination in excess of state standards may support a finding of liability, and may alone suffice for liability in some cases." *Id*. at 261.

The evidence of record here pales in comparison to the factual findings in *Interfaith Community Organization*. BIA tested thirty-six soil samples surrounding the defendants' dry cleaning facility. Only seventeen of those samples registered with PCE concentrations higher than the SHS of .5 mg/kg. Furthermore, the state standard used by plaintiff may not be an accurate measure of contamination for the site.

---

[4] The Court of Appeals also noted evidence of the presence of animals and organisms around the site and in the contaminated water, including the testimony of an expert who conducted "bioassay tests on sediment dwelling organisms." *Id*.

Dr. Bell used the .5 mg/kg standard (PA SHS soil to groundwater numeric value for acceptable concentrations of PCE) as his baseline for contamination throughout the reports. But BIA never sampled groundwater at the site, so Dr. Bell only considered the "criteria [he] would apply if [he] ever got groundwater." Bell Dep. 26:8-14, April 16, 2013 (ECF No. 14, Ex. P-3). Dr. Bell was not even aware if groundwater existed at the site, and if so, at what depth. Bell Dep. 37:25-28:2, 26:15-16.[5] Another standard available to Dr. Bell was the PA DEP direct contact in soil numeric value. Bell Dep. 27:3-8. None of the PCE levels found near defendants' former premises exceeded the acceptable direct contact concentration values. Bell Dep. 28:14-20.[6]

Dr. Bell explained that when he considered the values pertaining to PCE he looked at both standards and used the lower of the two values to evaluate contamination. Using the more stringent standard (the soil to groundwater value), only seventeen of the thirty-six samples collected by BIA exceeded the .5 mg/kg standard. The sample with the highest concentration of PCE registered 8.49 mg/kg, nearly 17 times the acceptable soil to groundwater standard, and the other excessive samples ranged between 1.242 and 15.48 times the standard. But the groundwater contamination values in *Interfaith* ranged from 200 to 8,000 times the state standard. *Interfaith Cmty. Org.*, 399 F.3d at 261. Dr. Bell stated none of the Prez Cleaners samples exceeded the direct contact in soil value; the contamination levels considered an imminent and substantial endangerment in *Interfaith* averaged 30 times the direct contact standard. *Id*.

---

[5] In an affidavit submitted to the court, defendant's proffered expert, geologist Paul White, offered clarification on the standards used by Dr. Bell. ECF No. 13, Ex. D-5. The soil to groundwater standard is "intended to be protective of groundwater under conditions where precipitation recharge from rainfall could migrate through the impacted soil, causing the impact to migrate to the water table resulting in concentrations in groundwater in excess of the 0.005 mg/L drinking water standard." *Id*. Mr. White averred "[t]he site is nearly fully covered by impervious surfaces, minimizing the volume of precipitation recharge that could flow through the soil." *Id*.

[6] Mr. White explained the direct contact concentration value is "intended to be protective of human health via direct contact" at the property. ECF No. 13, Ex. D-5. The highest PCE concentration found, 8.49 mg/kg, was significantly below the 1,500 mg/kg direct contact non-residential SHS and the 340 mg/kg residential SHS. *Id*.

The RCRA claim relies on evidence that certain soil samples exceeded one of Pennsylvania's state health standards.  This is insufficient to raise a genuine issue of material fact. *See, e.g.*, *Interfaith Cmty. Org.*, 399 F.3d at 260 (the RCRA is not dependent on state health standards); *Cordiano v. Metacon Gun Club, Inc.*, 575 F.3d 199, 212-14 (2d Cir. 2009) (samples exceeding Connecticut state health standards insufficient evidence to support a reasonable inference that the site presented an imminent and substantial endangerment).

To find an "imminent and substantial" endangerment, there must be a "reasonable prospect of future harm . . . so long as the threat is near-term and involves potentially serious harm." *Me. People's Alliance v. Mallinckrodt, Inc.*, 471 F.3d 277, 296 (1st Cir. 2006). The facts of record do not show a  prospect of future harm because the likelihood of any human contact with or endangerment from the PCE is minimal.[7]

The EPA Fact Sheet submitted by plaintiff lists three sources of potential human exposure: detection in drinking water supplies from contaminated groundwater sources; concentrations in ambient air; and occupational exposure. ECF No. 14, Ex. P-4 (Part 2). Plaintiff's counsel conceded "there is no claim of environmental injury or damages to ground water either at the shopping center involved or in the immediate vicinity." ECF No. 13, Ex. D-7. Most of the potential health hazards documented in the fact sheet result from inhalation exposure, a danger not cited by plaintiffs.  ECF No. 14, Ex. P-4 (Part 2).  The record includes no evidence that PCE air concentrations may cause harm.  Plaintiffs have "no soil vapor information" and

---

[7] Evidence of future harm to the environment would also be sufficient to show imminent and substantial endangerment, but plaintiff has failed to produce any evidence of environmental harm. *See, e.g.*, *Interfaith Cmty. Org.*, 399 F.3d at 262. There is no evidence of record of any potential harm to local wildlife or ecosystems or that the PCE has entered the main water streams of the community.  *Id*.

9

have performed no "indoor air monitoring." Bell Dep. 70:12-17.[8]  The only potential impact on

human life or potential exposure relied on by plaintiffs, besides the soil contamination, is the

possibility of PCE possibly moving into the permeable bedding materials around the local water,

sewer and gas utilities. ECF No. 13, Def. Ex. 1.  When asked about this risk during his deposition,

Dr. Bell could not say if any PCE was moving towards the utilities. Bell Dep. 85:19-86:5.[9]

Plaintiff may have failed to produce evidence that could create a material dispute of fact in part

because it did not implement the BIA recommendations to perform additional research and

testing.  In *Cordiano v. Metacon Gun Club, Inc.*, the Second Circuit Court of Appeals considered

an expert report concluding a "potential exposure risk to both humans and wildlife" existed and

recommended a "risk assessment" as "necessary to evaluate the degree of risk to humans and

wildlife." 575 F.3d at 211.  Because the plaintiff never performed such a risk assessment, the

record was "insufficient to permit a factfinder to assess the magnitude of the possible risk," and

therefore "insufficient evidence [existed] for a jury to find that the alleged contamination presents

a reasonable prospect of future harm, and hence that it may present an imminent and substantial

endangerment to health or the environment."  *Id*. at 211-12.  Here, plaintiffs also never performed

additional testing to support a reasonable prospect of future, rather than speculative, harm.

---

[8] Mr. White avers the highest PCE concentration identified, 8.49 mg/kg, "is also below the 10.0 mg/kg soil screening values for protection of indoor air at non-residential properties.  This concentration is intended to be protective of inhalation of vapors that could migrate from the soil into the air within the structure."  ECF No. 13, Ex. D-5.

[9] Despite Dr. Bell's extensive education and experience, he was unable to testify conclusively about any dangers to health and human safety because he lacked the necessary research and facts.  Defense counsel systematically questioned Dr. Bell about the hazardous allegations in the plaintiff's complaint, including the "chlorinated solvent plume," and that solvents are seeping "into underground water aquifers as well as pipelines providing water." Dr. Bell consistently responded that he was not aware of any facts to substantiate the allegations. Bell Dep. 71 - 74.  Based on the lack of sufficient facts, the court would hesitate to find Dr. Bell's conclusions admissible under Federal Rule of Evidence 702.

Considering all the evidence in the light most favorable to plaintiff, the court finds plaintiff has failed to show it can prove an imminent and substantial endangerment to human health or the environment. The court will grant summary judgment for defendants on Count I.

### 2. Contribution

A claim under the RCRA also requires the plaintiff to show the defendant is contributing or has "contributed to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste." 42 U.S.C. § 6972(a)(1)(B). The court will not address this because the plaintiff has failed to prove an imminent and substantial endangerment.

### B. Breach of Contract

Defendants make no argument on the merits of the contract claim in their motion for summary judgment, but contend if the court grants summary judgment on the RCRA claim there is no longer subject matter jurisdiction for the breach of contract claim because there is no diversity of citizenship or other federal question. Defendants move for summary judgment on this claim.

The court has subject matter jurisdiction on the breach of contract claim because it forms part of the same case or controversy as the RCRA claim. 28 U.S.C. § 1367(a). "A district court's decision whether to exercise [supplemental] jurisdiction after dismissing every claim over which it had original jurisdiction is purely discretionary." *Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009). The court has gained substantial familiarity with the facts involved and will exercise jurisdiction over the contract claim.

### III. Motion to Compel

In their pretrial memorandum of September 26, 2013, defendants asked the court to require plaintiff to respond to several outstanding discovery requests. ECF No. 17. On October

11

7, 2013 defendants filed a motion to compel responses to interrogatories and document requests. ECF No. 18.

Discovery closed on April 3, 2013.  No requests were made to the court concerning outstanding discovery prior to that date.   The requested information relates to potential witnesses from Bristol Township, the municipal body that could potentially be involved in remediation efforts at the site.  As the only remaining claim against defendants is breach of contract, this information should no longer be necessary. The motion to compel will be denied.

## IV.   Conclusion

The motion for summary judgment will be granted as to Count I and denied as to Count III.  The motion to compel will be denied. An appropriate Order follows.